**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |  |
|---|---|---|
| BANDA, | : |  |
|  | : |  |
| Plaintiff, | : | Civil No. 07-4508 (WJM) |
|  | : |  |
| v. | : |  |
|  | : |  |
| JON CORZINE, et al., | : | **O P I N I O N** |
|  | : |  |
| Defendants. | : |  |

**APPEARANCES:**

    JOHN BANDA, Plaintiffs Pro Se
    Special Treatment Unit
    Avenel, New Jersey 07001

**WILLIAM J. MARNINI, District Judge**

This matter is before the Court on an application from Plaintiff John Banda ("Banda") that this Court construes as Plaintiff's motion for reconsideration. For the reasons stated below, Plaintiff's motion for reconsideration will be denied.

**STANDARD OF REVIEW**

Generally, there are four basic grounds upon which a motion for reconsideration may be granted: (a) to correct manifest errors of law or fact upon which the judgment was based; (b) to present

newly-discovered or previously unavailable evidence; (c) to prevent manifest injustice; and (d) to bring a previously issued ruling in accord with an intervening change in prevailing law.  See 11 Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2810.1 (2d ed. 1995); see also Harsco Corp. v. Zlotnicki, 779 F.2d 906, 909 (3d Cir. 1985), cert. denied, 476 U.S. 1171 (1986)(purpose of motion for reconsideration is to correct manifest errors of law or fact or to present newly discovered evidence).  "To support reargument, a moving party must show that dispositive factual matters or controlling decisions of law were overlooked by the court in reaching its prior decision." Assisted Living Associates of Moorestown, L.L.C., v. Moorestown Tp, 996 F. Supp. 409, 442 (D.N.J. 1998).  However, mere disagreement with the district court's decision is inappropriate on a motion for reconsideration, and should be raised through the appellate process.  Id. (citing Bermingham v. Sony Corp. of America, Inc., 820 F. Supp. 834, 859 n.8 (D.N.J. 1992), aff'd, 37 F.3d 1485 (3d Cir. 1994); G-69 v. Degnan, 748 F. Supp. 274, 275 (D.N.J. 1990)). "The Court will only entertain such a motion where the overlooked matters, if considered by the Court, might reasonably have resulted in a different conclusion." Assisted Living, 996 F. Supp. at 442. Accordingly, a district court "has considerable discretion in deciding whether to reopen a case under Rule 59(e)."  Edward H. Bohlin, Co. v. Banning Co., Inc., 6 F.3d 350, 355 (5th Cir. 1993).

**DISCUSSION**

I.  **Procedural Background**

On September 21, 2007, the Clerk received the complaint docketed in the instant matter as Entry No. 1. The complaint asserted claims on behalf of numerous plaintiffs ("Plaintiffs"), Plaintiff Banda being listed the first.[1] See Docket Entry No. 1. On November 1, 2007, this Court issued an Order and accompanying Opinion ("November Order and November Opinion") dismissing the original complaint and terminating the instant case.[2] See Docket Entries Nos. 3, 4. Claims of certain Plaintiffs were dismissed without prejudice (and these Plaintiffs were granted leave to submit their amended complaints), while claims of other Plaintiffs were dismissed with prejudice. See id. In no ambiguous terms, Banda's claims were dismissed with prejudice and without leave to submit an amended complaint. See id. In addition, this Court enjoined the Clerk from opening any new matters, in which Banda seeks to act as a pro se in forma pauperis plaintiff asserting a

---

[1] Plaintiffs are a group of persons involuntary civilly-committed pursuant to the Sexually Violent Predator Act ("SVPA"), N.J. Stat. Ann. § 30:4-27.24 et seq., and confined at the Special Treatment Unit, Annex, Avenel, New Jersey ("Facility"); Plaintiffs "self-certified" themselves into a "class" for the purpose of filing their original complaint. See Docket Entry No. 1.

[2] All Plaintiffs other than Banda were terminated as Plaintiffs in this action, and the Clerk opened individual matters for each of these Plaintiffs. See Docket Entry No. 4.

civil rights violation, without first obtaining leave of the Court. <u>See</u> Docket Entries Nos. 3, 4.

On November 15, 2007, Banda executed a letter to the Clerk ("Letter") stating that Banda "underst[ood] that there [was] a problem on the way that [he was] submit[ing]/fil[ing] his complaints" and asking to "allow [him] to explain himself." Docket Entry No. 5.  Banda's explanation consisted of a four-page single-spaced statement having no bearing on the matters at hand, and ending with the request to the Clerk to

> [p]lease be advised, and please inform the Court that "WE THE PEOPLE OF THE UNITED STATES ARE SICK & TIRED OF GETTING RUN AROUND" in getting any kind of justice done in this Court, to which [Banda] asks for a change of venue [in this already terminated case] in having [h]is case heard, for it is obvious [to Banda] that [Banda] cannot get any kind of justice in this Court of any type matter.

Docket Entry No. 5, at 4 (capitalization in original).

On December 01, 2007, this Court received a package from Banda consisting of: (a) a cover letter ("Cover Letter") asserting that he had never received copies the November Order and November Opinion,[3] and (b) the document titled by Banda as "Amended

---

[3] This assertion appears to be wholly inconsistent with Banda's Letter, which unambiguously indicated that Banda was aware of the content of this Court's November Order and November Opinion, and did not indicate that Banda had not received his set of copies of the November Order and November Opinion.  <u>See</u> Docket Entry No. 5. Banda's Cover Letter indicated that Banda was confused as to the scope of the preclusionary order entered against him.  <u>See</u> Docket Entry No. 6, at 1 ("In a short time from now, [Banda] might be filing a Habeas Corpus [petition challenging] his involuntary civil commitment.  Does he need to ask the Court for permission for

Complaint," even though Banda's original complaint was dismissed with prejudice and, hence, he was not allowed to submit such a document.[4]  See Docket Entry No. 6.  In addition, Banda submitted his an application for appointment of pro bono counsel. See id. at 9-13.  Consequently, this Court: (a) construed Banda's "Amended Complaint" as a motion for reconsideration of this Court's November Order; (b) directed the Clerk to docket the Cover Letter and Amended Complaint in this matter, designating these submissions as Banda's motion for reconsideration ("Motion"); and (c) clarified the scope of the preclusionary order entered against Banda for the purposes of Banda's future filings with this District, if any.  See Docket Entry No. 7.

## II.  **Banda's Statements Do Not Provide Basis for Reconsideration**

### A.  **Original Complaint**

#### 1.  ALLEGATIONS

This original complaint submitted by Plaintiffs alleged that, on August 30, 2007, Plaintiffs' constitutional rights were violated by one hundred and eight defendants.[5]  See Docket Entry No. 1.

---

filing that too???").

[4] The package did not include any document seeking change of venue.

[5] The list of original Defendants was as follows: Defendant Jon Corzine, Governor of the State of New Jersey; Defendant George Hayman, Commissioner of New Jersey Department of Corrections; Defendant Bernard Goodwin,

The allegations set forth in the original complaint fell into two categories: (1) those common to all Plaintiffs; and (2) those based on the circumstances particular to--and, therefore, presenting claims unique to--individual Plaintiffs. See id. The allegations common to all Plaintiffs were summarized by this Court as follows:

> According to Plaintiffs, the chain of August 30th events started at 8:25 A.M. with the appearance of an unnamed corrections officer, who was "with a 'gun.'" Allegedly, five minutes later, at 8:30 A.M., Plaintiffs . . . were "ordered to the Dayroom [and] told to line up and face the wall, [and] keep eyes forward." Plaintiffs allege that, five minutes later, they were "pat-searched and led to the Rec[reation] Yard." Seven minutes after they entered the recreation yard, Plaintiffs were handed cups and served with, approximately, half-a-cup of water per person. From this point on, water was re-served to Plaintiffs on half-an-hour or hourly basis, although Plaintiffs were finding the supply of water insufficient, and the water itself insufficiently chilled. According to Plaintiffs, at 8:45 A.M., that is, thirteen minutes after Plaintiffs were removed into the recreation yard, the Facility officials brought drug-sniffing canines into the Facility and began a search for controlled substances; the search inside the Facility continues for one hour and twenty-two minutes, and it was followed by a one hour and thirteen minutes search of the external parts of the Facility and adjoining trailers. After the search was completed, Plaintiffs were ordered to line up in the recreation yard . . . and, fifteen minutes later, an unspecified number of [Plaintiffs] . . . was brought

---

Administrator of the Facility; Defendant Cindy Sweeney, Assistant Superintendent of the Facility; Defendant Ann Milgram, Attorney General for the State of New Jersey; Defendant Merrill Main, Clinical Director of the Facility; Defendant Tina Spanuolo, Supervising Program Specialist at the Facility; and one hundred John/Jack/Jane/Joan Doe Defendants, who are corrections officers or public advocates employed by the State of New Jersey, as well as Defendant John Doe, who is a "Regional Commander of Department of Corrections." See id., caption.

> into the Facility for lunch.  About half an hour later, another group of [Plaintiffs] . . . was brought into the Facility for lunch.  The remaining [Plaintiffs] . . . were brought into the Facility to consume lunch in unspecified sub-groups and time increments, with the last Detainee being brought into the Facility no later than at 1:25 P.M., that is, about two hours after the entire lunch service started. Plaintiffs assert[ed] that Plaintiffs experienced "intimidation" during their return to the Facility as a result of a "show of force" which ensued from the fact that the Facility officers were "holding . . . 'Riot Guns.'"  Plaintiffs assert[ed] that [they] were denied (a) access to bathrooms for the period of five minutes, and (b) access to showers for about ten minutes. The . . . "Dayroom" and Mess Hall became . . . available for regular use by [Plaintiffs] one hour and twelve minutes after all [they] returned to the Facility.

Docket Entry No. 3, at 3-6 (citations and footnotes omitted).

In addition, the Court's November Opinion summarized allegations unique to each Plaintiff.  See id. at 6-11.  With respect to Banda, the Court noted that the original complaint alleged that

> on September 2, three days after the events of August 30, 2007, . . . Banda . . . went to see a medical doctor complaining about having sun poisoning. . . . Banda [was] experiencing swollen puffy eyes, and . . . allegedly had a bad sunburn on his forehead and nose. Responding to [his medical] complaint[], the Facility's doctor prescribed [him] Tylenol for the puffy swollen eyes [and] Silver Sulfadiazine Cream for the sunburn.

Id. (quotation marks and original brackets removed, citations omitted).

>     2.   TREATMENT OF THE COMMON CLAIMS AND BANDA'S CLAIMS

Responding to Plaintiffs' common claims that

> the search for controlled substances performed by the Facility officials was an "unlawful 'prison' search" impermissible with respect to . . . civilly-committed . . . Plaintiffs [as well as to Plaintiff's allegations that] the search . . . amounted to a cruel and unusual punishment . . . since: (a) "there was [n]o shade in the [recreation] yard with the exception of a small tent[,] which could not accommodate" [everyone in the yard]; (b) [the outside temperature was] 90 to 95 degree[s]"; (c) re-servings of water to [Plaintiffs] was no more frequent than every half an hour and the water served was "usually warm"; and (d) corrections officers "brandished M-16 style guns with individualized mace balls, [and] other weapons[,] such as batons and night sticks[,] were also brandished,"

id. at 12, the Court dismissed these allegations for failure to state a claim upon which relief may be granted.  See id. at 21-36.

Addressing Plaintiff's Fourth Amendment claims, the Court explained that, pursuant to Hudson v. Palmer, 468 U.S. 517, 530 (1984), and Bell v. Wolfish, 441 U.S. 520, 558-560 (1979), the search of the Facility was not "illegal," because Plaintiffs' expectation of privacy yield to the Facility officials' legitimate governmental interests to ensure that the Facility remains free of controlled substances.  See Docket Entry No. 3, at 22-23.

With respect to Plaintiff's due process claims, the Court subdivided Plaintiffs' allegations into three groups: (1) those challenging Plaintiffs' conditions of confinement; (2) those asserting verbal and "visual" harassment; and (3) those related to Plaintiffs' medical conditions.  See id. at 23-36.  The Court

clarified to Plaintiffs that acts or verbal (or "visual") harassment cannot, on their own, serve as a basis to cognizable constitutional challenges. See id. at 30-31.

Addressing Plaintiffs' medical claims, the Court first detailed to Plaintiffs the applicable standard. See id. 32 (citing Rhodes v. Chapman, 452 U.S. 337, 346-47 (1981); Estelle v. Gamble, 429 U.S. 97 (1976); and Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999)). Then, pointing out that, according to the original complaint, the Facility's corrections officers and medical staff were highly attentive to--rather than deliberately indifferent--to Plaintiffs' medical needs, and these needs were minor, the Court dismissed the bulk of Plaintiffs' medical claims with prejudice.[6] See id. at 33-35.

Next, with respect to Plaintiffs' conditions of confinement claims, the Court explained to Plaintiffs that the Third Circuit established a two-part test reading as follows:

> we must ask, first, whether any legitimate purposes are served by these conditions, and second, whether these conditions are rationally related to these purposes. In assessing whether the conditions are reasonably related to the assigned purposes, we must further inquire as to whether these conditions cause [inmates] to endure [such] genuine privations and hardship over an extended period of time, that the adverse conditions become excessive in relation to the purpose assigned to them.

Union County Jail Inmates v. Di Buono, 713 F.2d 984, 992 (3d Cir.

---

[6] The Court allowed those Plaintiffs that might have suffered serious medical need to submit amended complaints clarifying the medical treatment they received. See Docket Entry No. 3, at 35-36.

1983). Taking judicial notice of the weather conditions existing in Plaintiffs' locale during the hours at issue,[7] the Court concluded that, being placed in the Facility's recreation yard for three to five hours on a summer morning, when the weather conditions were mild, could not amount to a "hardship over an extended period of time," or to an "adverse conditions" excessive in relation to the purpose of keeping Facility detainees outside the Facility during a legitimate search for controlled substances. See id. at 26-27. Consequently, the Court dismissed all Plaintiffs' common claims. Finally, turning to Banda's personal claims that he experienced "swollen puffy eyes" and a "sunburn on his forehead and nose," the Court noted that these claims did not assert a serious medical need and, even if they did, these allegations would not qualify as a basis for a constitutional challenge in view of the fact that, according to the original complaint, Banda received sufficient medical treatment immediately upon complaining about his condition to the Facility's medical staff. See id. at 34 and n. 19.

---

[7] The weather conditions were as follows: temperature varied between 72 and 84.5 degrees Fahrenheit, humidity was 61 percent, and western wind varied from 3.5 to 6.9 mph. See Docket Entry No. 3, at 26

### B. Banda's Motion for Reconsideration

The gist of Banda's Motion is set forth in the "Amended Complaint" part of his submission. The "Amended Complaint" names, as defendants, "John Doe, Regional Commander of the Department of Corrections Special Operations Group" and Jack Does, 1-40, who are "Department of Corrections Special Operations Group Correctional Officers." Mot. at 5. Banda asserts that these Defendants "gave unprofessional errors of judgement and gross negligence in ordering and enforcing the removal of all [Facility detainees] from the . . . [b]uilding to stay out in [h]ot [s]un for approx[imately six and a half] hours,[8] which caused injury to [Banda] in getting a severe sunburn with swollen puffy eyes." Id. at 5-6. Banda seeks $815 million in damages. See id. at 8.

In support of his allegations, Banda first recites the same allegations that were stated in Plaintiffs' original complaint and were dismissed by this Court's November Order and Opinion, and then provides a number of statements ("Supplemental Statements") apparently intended to convince the Court that Plaintiffs suffered

---

[8] The time-line of events set forth in the original complaint indicates that Plaintiffs were taken to the recreation yard around 8:30 A.M. and returned back to the Facility no later than at 1:25 P.M., see Docket Entry No 1, at 10-11, that is about five hours later. The basis for Banda's six-and-a-half hours calculation is not clear either from the face of the original complaint or from Banda's Motion. However, for the purposes of this Court's constitutional analysis, the difference between five hours and six and a half is of no impact.

from a severe hardship[9] due to the conditions of confinement existing during the hours when Plaintiffs were in the recreation yard on August 30, 2007.[10]  See id. at 6-7.  The Supplemental Statements could be roughly subdivided into two categories: (1) generic proclamations expressing Banda's apparent displeasure with the existing legal regime, under which Banda's claims were dismissed; and (2) arguments against the Court's conclusions stated

---

[9] Banda's Motion ignores this Court's explanation that Banda cannot raise claims jus tertii.  See Docket Entry No. 3, at 54-55, n. 27 (addressing the jus tertii issue).

[10] Banda expressly notes that he has no claims as to the medical care he obtained. See Mot. at 7.  Yet, simultaneously with that statement, Banda asserts that on the date of the search, that is, August 30, 2007, the NJ DOC "instructed [the medical staff of the Facility] to only allow the life threatening injured [Plaintiffs] to be allowed to go to the [nurse]." Id.  It appears that Banda's aforesaid statement is made in response to the Court's observation that Banda waited till September 2, 2007, i.e., three days, to seek medical attention for his sunburn and puffy eyes.  See Docket Entry No. 3, at 34 (observing Banda "elected to wait three days prior to contacting a medical doctor at the Facility").  Now, Banda seems to claim that "[t]here was no doctor on duty . . . on 08/30/07." Mot. at 7.  However, Banda could certainly see a nurse or a doctor on August 31 or September 1, and yet elected to wait till September 2.  If the Court is to presume that Banda acted upon his desire to be seen by a particular doctor who was on duty on September 2, 2007, rather then to see a nurse or another doctor on August 31 or September 1, such presumption would not salvage Banda's claims, since the fact that Banda was not availed to a visit with the doctor or nurse of his choice cannot indicate that the Facility officials denied him medical care. See, e.g., McNeil v. Redman, 21 F. Supp. 2d 884 (C.D. Ill. 1998) (there is "no constitutional right to see a doctor on demand; the decision whether to summon a doctor, like the question of whether a certain diagnostic technique or form of treatment should be prescribed, 'is a classic example of a matter for medical judgment'") (quoting Estelle, 429 U.S. 97).

in the November Opinion.  The former category (consisting of such statements as "[t]here is nothing therapeutic about the unprofessional errors of judgement & gross negligence that was display[ed[ toward [Plaintiffs" and "[t]he . . . Facility may be on [p]rison grounds, but it does not give [the Facility officials] the authority to mis[]treat [Plaintiffs] as 'Lesser Breeds' or 'State Prisoners' by ordering, enforcing and carrying out the unprofessional errors of judgement & gross negligence orders," id. at 7) does not amount to either a factual assertion or to a legitimate challenge to the Court's November Order.  Being nothing but a compilation of Banda's "bald assertions" and "legal conclusions," these statements add nothing to the original complaint, see Morse v. Lower Merion School Dist., 132 F.3d 902, 906 (3d Cir. 1997), and presents no argument cognizable for the purposes of motion for reconsideration.  See Harsco Corp., 779 F.2d at 909.

   The latter category consists of two Supplemental Statements.  The first statement appears to be made in response to the Court's finding that "Plaintiffs' allegations that the initial servings of water were in amounts less than Plaintiffs desired, or that the re-servings of water were not as frequents as Plaintiffs wished, and that the water was not chilled to meet Plaintiffs' preferences, do not state a viable deprivation claim in view of the fact that Plaintiffs were actually served water at repeated intervals, and

even if the ration was limited, the limitation continued for three to five hours only." Docket Entry No. 3. at 27. In apparent attempt to state his opinion that the water-related allegations should be deemed a severe deprivation, Banda now alleges that

> [t]here was no running water in [the recreation yard], there [were] only two containers of water out there, which WAS NOT enough to accommodate [Plaintiffs and other detainees in the Facility], and [the supply of water] WAS NOT re-filled on the hour, every hour; [Plaintiffs] had to go thru a[]lot of grief in getting the two containers re[]filled, but when they were refilled . . . it was mostly very warm and Not refreshing to drink on a Hot Sunny Day.

Mot. at 7 (capitalization and ellipsis in original). Banda's recital of his original claim in terms of water being "not refreshing" enough does not provide this Court with valid grounds for reconsideration. Banda's allegations do not to suggest that this Court committed a manifest error of law or fact; it neither presents newly-discovered or previously unavailable evidence nor indicates intervening change in prevailing law. See Harsco Corp., 779 F.2d at 909. At most, it reflects Banda's disappointment with the Court's finding that a limited supply of water (that neither posed a health-threatening risk of dehydration, nor amounted to "punishment" in any other respect) cannot transform Plaintiffs' conditions of confinement into a violation of their constitutional rights.

Banda's second statement provides the Court with information not mentioned in the original complaint. Specifically, Banda

asserts that there was "[n]o bathroom in the [Facility's recreation yard] except for only one 'OUTHOUSE' to accommodate the 210 [detainees at the Facility, Plaintiffs included]." Mot. at 7. The Court presumes this information is meant to imply that certain Plaintiffs, which might or might not included Banda, had to endure a certain (and, perhaps, substantial) wait in the event they wished to use the bathroom. However, this information does not present newly-discovered or previously unavailable evidence, since Plaintiffs were well aware of this information by the time they submitted their original complaint and, thus, does not provide the Court with a valid basis for reconsideration of its November Order.[11]

---

[11]
Moreover, allegations of a waiting line to use the bathroom does not state a constitutional claim. As this Court already explained, only

> [w]here a civil detainee is *completely* denied usage of the toilet *over the period of many hours*, such denial *might* give rise to a constitutional violation. See, e.g., Campbell v. City of Bakersfield, 2006 U.S. Dist. LEXIS 49930 (E.D. Cal. July 21, 2006) (complete prohibition on usage of the toilet by a civil detainee over the period of nine hours might amount to a potential constitutional violation); Wine v. Dep't of Corr., 2000 U.S. Dist. LEXIS 22555 (W.D. Wis. Dec. 27, 2000) (finding a potential constitutional violation where detainees were placed on a bus and shackled to one another, and were allowed to use the toilet only twice during a 32-hour trip, and such limitation caused the inmates to urinate and defecate on themselves, and to become sick as a result of overflowed urine and feces running on the floor where inmates and soiling their feet, shoes and pants). By contrast, if denial of access to the toilet lasts a few hours or is not a "complete" denial, such denial

In sum, Banda's Motion presents nothing but an elaborate recital of the claims (already dismissed by this Court in its November Order) laced with Banda's bald assertions and legal conclusions. Such recital provides this Court with no basis for reconsideration.

Therefore, Banda's Motion will be denied.

### **CONCLUSION**

For the foregoing reasons, Banda's Motion for Reconsideration will be denied. Banda's application for appointment of pro bono counsel will be denied as moot.

An appropriate Order accompanies this Opinion.

s/William J. Martini

**WILLIAM J. MARTINI**
**United States District Judge**

Dated:   1/3/08

---

cannot supply sufficient grounds to support a constitutional claim. See Heitschmidt v. City of Houston, 161 F.3d 834, 837-38 (5th Cir. 1998) (complete prohibition on usage of the toilet by a civil detainee cannot amount to a constitutional violation if it lasts only four hours).

Docket Entry No. 3, at 27-28, n. 15 (emphasis in original).